CLAUDIE KEYS et al., Respondents, v. THE NATIONAL COUNCIL KNIGHTS AND LADIES OF SECURITY, Appellant.

Kansas City Court of Appeals, December 1, 1913.

1. .FRATERNAL BENEFICIARY ASSOCIATIONS: Premuims: Suspension for Nonpayment. Where the by-laws, rules and regulations of a fraternal insurance order provides that failure to pay the specified monthly premiums on or before the last day of the current month shall cause the member to be suspended without further action of any kind, any member failing to pay. such monthly premiums is, *ipso facto*, suspended at midnight on the last day of said month and, if death occurs during such suspension, such member's policy cannot participate in any of the funds or benefits of the order, unless the suspension and forfeiture caused thereby has been waived by the company.

2. ————: ————: ————: ————: Waiver. In the case at bar, waiver may be of two kinds, first, waiver of forfeiture by accepting and retaining premiums with knowledge of the facts constituting the forfeiture, or by retaining the premiums after receiving knowledge of the facts, and, second, waiver of the defense of forfeiture by failing to assert a forfeiture after a loss has occurred, and, with knowledge of such forfeiture, inducing the beneficiaries under the policy to go to trouble and expense in complying with the terms of the policy as if it were in force.

3. ———: ———: ———: ———: ———. Waiver, by acceptance of premiums, is not based on contract, but on estoppel of the company to insist upon conditions of the policy inconsistent with the acceptance or retention of the premiums. While waiver is a matter of intention, this means the intention the law will infer from a given course of conduct and not the mere purpose the insurer may have had in mind. Waiver arises from the doing of inconsistent acts. The intention to waive is gathered from what is done. And if a forfeiture has been once waived it cannot be subsequently revived and relied upon to defeat a recovery after a loss has happened.

4. ———: ———: ———: ———: ———. Where the rules prescribe that a member, suspended for failure to pay dues, may be reinstated without a health certificate upon payment of said dues at any time within sixty days from suspension, provided such member is in good health, the forfeiture caused by such delinquency and ill health is waived by the acceptance of premiums with knowledge of such ill health. And, if in addition to the above, the rules prescribe that a member, paying up delinquent dues, after the lapse of sixty days from suspension, shall furnish a medical certificate of good health, then the known acceptance of dues so paid, without requiring the health certificate, is a waiver of the ill health and of the forfeiture caused thereby.

5. ———: ———: ———: ———: ———. A waiver of a defense cannot be inferred from mere silence of the company. It is not obliged to do or say anything to make the forfeiture effectual. But if, after knowledge of the forfeiture, negotiations or transactions are had with the insured in which the company impliedly recognizes the continued validity of the policy, or does acts based thereon, or requires the insured by virtue thereof to do some act or incur some trouble or expense, the forfeiture is waived as matter of law, and such waiver need not be based upon any new agreement or an estoppel.

6. ———: ———: ———: ———: ———: Evidence: Jury Question. Where the issue is whether or not the company has followed a course of conduct which may be said to indicate waiver, the question of waiver is one for the jury. And where there is evidence from which waiver may be inferred the question must be left to the jury.

7. INSTRUCTIONS: Omission in. An instruction defining waiver, which was the real point at issue in the case, cannot be upheld where, on account of the omission therefrom of certain words, it is meaningless. In such case the argument made to the jury cannot be looked to in order to learn whether the jury were informed of what was its meaning. Instructions are

difficult enough to understand without requiring the jury to guess at the meaning or at what was intended to be said in the instruction.

Appeal from Buchanan Circuit Court.—*Hon. W. K. Amick,* Judge.

REVERSED AND REMANDED.

*William E. Stringfellow* for appellant.

*F. W. Paschal* for respondents.

TRIMBLE, J.—This is a suit on a fraternal beneficiary certificate of insurance issued by the defendant to one of its members, M. M. Keys, whereby it agreed to pay $2000 to the beneficiaries therein named, upon the death of said M. M. Keys while a member of said order in good standing.

The plaintiffs are the said member's three minor children who were named as beneficiaries in said certificate, and they prosecute this suit through their statutory guardian.

Mrs. Keys died December 28, 1910. It is defendant's contention that, at the time of her death, she had forfeited her rights and was not a member in good standing, but stood suspended by reason of her failure to pay certain monthly premiums, dues or assessments, within the time required. Plaintiff met this contention with the charge that this requirement of prompt payment of said monthly dues, on pain of suspension if they were not so paid, had been waived, and that defendant was estopped to defend the plaintiff's claim. A trial of this issue was had, and the jury found a verdict in favor of plaintiff for the amount due on the certificate. Defendant appeals, and contends that there was no evidence of any waiver.

Mrs. Keys had been a member and the holder of the certificate in the order since October 4, 1901. On

May 26, 1904, the plaintiffs were duly named therein as beneficiaries in place of the former beneficiary. By the rules of the order and the terms of the contract, the member was required to pay a certain premium each month, and if same was not paid on or before the last day thereof, the member, *ipso facto*, stood suspended at midnight of said last day. During such suspension the member had no rights under his or her beneficiary certificate, and, if death occurred while such member was thus in suspension, nothing could be collected on said certificate. But if, at any time within sixty days after suspension, a member paid up the assessments which were delinquent, he was reinstated to his full rights, provided, that at the time of making such payment, he was in good health. When such delinquent dues were thus paid, however, the defendant accepted them without investigating to learn whether such member was in good health or not, and no form or ceremony was required to perfect a reinstatement; the money was received and the member marked "reinstated" on the books. If the payment of the delinquent dues occurred after the lapse of sixty days from delinquency and consequent suspension, then, according to the written rules and terms of the contract, a medical examination certificate showing good health, was required before the member could be reinstated.

The defendant order was composed of various "councils," each located in its respective community and made up of the individual members at that place, and the executive head of the institution, or "national council" as it was called, was located at Topeka, Kansas. Mrs. Keys was a member of the local council at St. Joseph. In each local council there was an officer called the "financier." The individual members of the order paid their assessments or monthly dues to this local officer, and it was his duty to send the money thus collected by him to the national council each

month, together with a detailed statement showing the names of the members who paid, the amount of each payment, the rate, and other items of information. If a member's name did not appear on this report as having paid his assessment, the absence of his name showed that he was delinquent, and his delinquency was apparent in each succeeding monthly report until his name appeared with a credit of the amount paid by him in settlement of the assessments due. It was the custom and general practice of these various local officers or "financiers" to send in their reports of collections for each month about the 20th of the succeeding month, and to include in such report *all collections and payments made up to the time of sending in the report*. This was well known and understood by the head council, and was in fact recognized by its rules.

Deceased failed to pay her assessment for May, 1910, and at midnight of the 31st of that month, she, *ipso facto*, stood suspended. The report of the local "financier" to the national council made June 20, revealed this fact because no payment by her was reported therein. She also failed to pay her assessment for June, 1910, and again the local "financier's" report made about the 20th of July showed her delinquency. It was therefore apparent to the company itself, as well as to the agent that she was delinquent for both May and June. She did not pay any assessments or premiums during July, but on August 20, 1910, being then delinquent for July also, she paid the three assessments for May, June, and July, and these were sent in by the local "financier" in his report for July, and Mrs. Key's name was thereupon marked "reinstated." The premiums for August and September, 1910, were thereafter paid within the time required for them. At the time the delinquent payments for May, June, and July, were made, that is, on August 20, 1910, Mrs. Keys was not in good health but no inquiry in regard thereto was made either by the local "financier" or

by the head or "national council," following their usual custom of accepting delinquent premiums and reinstating the member without asking as to health. These payments were made to the local "financier" by Mrs. Keys' son who was directed by her to do it, she not being able to go to the financier's office.

On August 8, 1910, Mrs. Keys went to a hospital in Kansas City suffering with cancer of the uterus, an incurable disease from which she died in the hospital on December 28, 1910, having remained at the hospital constantly from the time she entered it.

On December 27th, the day before she died, Mrs. Keys told her son to pay the premiums for October, November and December, amounting to $6.50 and he sent a draft for that amount to Mr. Webb, the local "financier" at St. Joseph, with a letter telling him it was in payment of his mother's premiums. Webb observing that the money was not sent in Mrs. Keys name, did not credit it on the books but wrote to the son that he held it only on condition his mother was in good health. Not receiving any reply to this, and learning, on December 30, of Mrs. Keys death, Webb, after consulting the president of the company at Topeka, Kansas, sent the money to J. B. Hinkle at Kansas City, with minute directions to return it to Mrs. Keys' son, and, if he refused to take it, to make him a formal tender of it. Hinkle could not find young Keys and finally returned the money to Webb. Young Keys was a minor and one of the beneficiaries named in the certificate of insurance sued on. Hinkle could not find him in Kansas City because he had returned to St. Joseph.

Shortly thereafter an attorney went with a Mr. Brown, who seems to have been a relative or friend of the Keys children, to Webb's office and asked him if they were going to contest the payment of the Keys' claim. Webb told him he did not know, but that his instructions were to have a guardian appointed for the

children so that the matter could be taken up. The attorney then told him that the children had no other property requiring the appointment of a guardian, and that if the company intended to -refuse payment of the insurance claim, the appointment of a guardian was unnecessary, as suit could be brought by next friend. To which Webb replied that he did not know what the company would do but that it was necessary to have a guardian appointed, and such were his instructions.

Thereupon Bowen was appointed guardian for the three children by the probate court, and duly qualified. When he did so, Webb immediately tendered to him the $6.50 sent Webb to pay Mrs. Keys' last premiums.

As stated above, the answer set up that Mrs. Keys, by failing to pay the assessment for October, on or before the last day of that month, became suspended and her certificate void and all her rights thereunder forfeited inasmuch as she was not in good health when she paid the October assessment on December 27th. (It will be noticed that this assessment was paid within sixty days after the delinquency which occurred at midnight October 31st.) Plaintiffs' reply set up that defendant was estopped from setting up the failure to pay said assessment in the time specified by the bylaws, because the course of dealing with Mrs. Keys was such as to waive a strict compliance therewith in that regard; that Bowen, the guardian of the children, was not the legal representative of the estate of Mrs. Keys and that the tender to him of the $6.50 paid was not a tender to the proper person; that defendant knew, at the time of Mrs. Keys death, that she had not paid her premiums in time but, notwithstanding such knowledge, defendant had requested plaintiff to go to the expense of furnishing proofs of death and of having a guardian and curator appointed, by reason of which fact defendant was estopped from making any defense to plaintiff's claim.

It is the contention of defendant that it did not know Mrs. Keys was delinquent for the months of May, June and July when her premiums for those months were paid on August 20th, in the local "financier's office in St. Joseph; and that it had no knowledge nor means of knowledge of her ill health at that time and did not learn of such ill health until in the course of the trial. Consequently, after the evidence was in and the parties had rested, defendant asked leave to amend its answer so as to include said assessments for the seven months from March to September, 1910, both inclusive, and to state an offer to return, to a tender of, said assessments, aggregating $11.20, such amendment being sought to be made in order to conform to the proof. It appeared that on July 5, 1912, about three months before the trial, the defendant took the deposition of Dr. McCall of the hospital where Mrs. Keys died, and his testimony therein showed that Mrs. Keys was not in good health on August 20, 1910, and yet the company retained the premiums paid on that date and also those down to and including September paid thereafter, and did not offer to return them till after the case had closed. The court refused to permit the amendmment.

Where the issue is whether or not the company has followed a course of conduct which may be said to indicate waiver, the question of waiver is one for the jury. [Fink v. Ins. Co., 60 Mo. App. 673; Summers v. Ins. Co., 45 Mo. App. 46.]

It is thus seen that the problem to be first solved in this case is whether there is any substantial evidence from which a waiver can be inferred. If there is, then the verdict of the jury is, in the absence of error in the trial, determinative of that fact.

In order to correctly determine whether or not there is any evidence that a waiver was created by the course of dealing adopted by the company, it is necessary to keep clearly in mind just what constitutes a

waiver, what are its constituent elements, and how it
may be shown. "Waiver by the acceptance of a pre-
mium is not based upon contract, but on estoppel of
the company to insist on conditions of the policy incon-
sistent with the acceptance or retention of the pre-
mium." [Monahan v. Ins. Co., 63 Atl. 211, l. c. 214.]
While it is sometimes said that waiver is a matter of
intention, this does not mean that the one alleged to
have waived must have expressly or purposely in-
tended to waive. The waiver arises from the knowingly
doing of inconsistent acts. The intention to waive is
gathered from what is done, and if a person, with
knowledge of the facts, does something inconsistent
with a right or of his intention to rely on it, his act will
constitute a waiver even though he may not have had in
mind any purpose or intention to waive. [Tobin v.
Western Mut. Aid Society, 72 Iowa, 261, l. c. 264.]
The test of a waiver is whether the acts and conduct
of the insurer are inconsistent with the intention to
insist on strict compliance with the terms of the pol-
icy. [Lake v. Ins. Co., 81 N. W. 710, l. c. 712.] If a
forfeiture has been once waived, it cannot be subse-
quently revived and relied upon to defeat a recovery
after a loss has happened, for a forfeiture that is
waived is treated as having been eliminated from the
contract. [Baltimore Ins. Co. v. Howard, 52 Atl. 397,
l. c. 399; Burgess v. Mercantile Ins. Co., 114 Mo. App.
169, l. c. 184.] As between insurance companies and
their beneficiaries, a rigid application of the general
rule that there shall be actual knowledge of the for-
feiture or of the cause producing the forfeiture be-
fore a waiver can be shown, will not be insisted upon
in all cases. [Monahan v. Ins. Co., supra; Baltimore
Life Ins. Co. v. Howard, supra.] "If the company
ought to have known of the facts or with proper at-
tention to its own business would have been apprised
of them, it has no right to set up its ignorance as an ex-
cuse." [Knights of Pythias v. Kalinski, 163 U. S. 289,

l. c. 298.] Slight evidence, indicating an intention to waive, will be sufficient to prevent a forfeiture from taking effect and thereby defeating valuable rights. [Francis v. A. O. U. W., 150 Mo. App. 347, l. c. 356.] A waiver of forfeiture may be inferred when the insurer, after knowledge of the act of forfeiture, requires the assured, by virtue of the requirements in the policy, to do some act or incur some expense. [McCollum v. Niagara Ins. Co., 61 Mo. App. 352; Supreme Tent Knights of Maccabees of the World, 57 N. E. 203, l. c. 207.]

Applying these principles to the facts in the case before us, we find: 1. That the company was in the habit of accepting premiums from suspended members, at least if paid within sixty days from suspension, without inquiry as to whether they were in good health or not. 2. That the company knew, whenever a report for a month came in, that a member, whose name was not shown as having paid a premium, was delinquent and suspended. 3. That it knew that reports of collections were not sent in until the 20th of each month, and that all collections made up to the day of sending the report in were included in the report. 4. That the local "financier's" office knew, on August 20, 1910, that Mrs. Keys was delinquent and stood suspended from May 31st, more than sixty days previous, and yet took the premiums paid at that time without inquiring as to her health and *without demanding the certificate of medical examination showing good health.* She was marked "reinstated" although the by-laws provided that she could not be reinstated without the aforesaid certificate. It seems to the writer that the acceptance of the premiums paid on August 20th, when a certificate of good health was necessary, and Mrs. Keys' reinstatement without such certificate, was a reinstatement of her *without regard to the question of her health.* But it is said the company itself did not know Mrs. Keys was more than

sixty days in arrears when she was reinstated. But the local financier's office knew it, and this knowledge was knowledge of the comapny. It knew that reports for preceding months were not sent in until the 20th of each succeeding month, and that this report was not sent in until after the 20th of August; and it knew also that the local "financier" sent in all moneys collected up to the date of sending in their reports. The blanks used in sending in such reports had no provision therein for showing the date when moneys were actually paid to the "financier." Hence, if the company did not know from the report that the premiums were paid after the lapse of sixty days from the date they were due, its ignorance was not the result of any deception practiced by Mrs. Keys, but was the result of the act of the company's agent in reporting it and of the method of sending in all collections received up to the date of the report. Nor was it the result of any conspiracy on the part of Mrs. Keys and the agent to defraud the company. If the company, by its method of obtaining reports and allowing them to be made without showing when the money was actually paid to its agent, could not tell whether payments were made on time, or, if not on time, whether they were within the sixty days, it would appear to the writer that the company ought not to be permitted to set up its own ignorance, resulting from its own negligent system and method of transacting business, as a valid reason for the nonapplication of the doctrine of waiver. [Monahan v. Mut. Life Ins. Co., 63 Atl. 211, l. c. 213.] In the absence of fraud on the part of Mrs. Keys it is difficult to see why a different rule should be applied to a company of this character from that applied to any other. But, even if it be true that a mutual, fraternal, company of this kind should be permitted to indulge in the presumption that, when the agent sent Mrs. Keys' name in as having been reinstated, he did so because she paid her premiums inside and not out-

side of the sixty days, and to indulge in the further presumption that, if she did pay it within the sixty days, she was in good health, and therefore the company's reception and retention of such premiums would not constitute a waiver, in the absence of knowledge that it was so paid out of time, still evidence of all such facts is admissible where there is other evidence tending to show that the company did have knowledge of the situation and manifested an intention to receive said premiums and retain them regardless of her health or ill health. That is to say, if, in addition to all the facts above set out showing the habit of the agent to send in all collections actually required up to to the 20th and defendant's method of keeping the accounts, there is evidence of defendant's conduct *from which it may be inferred that defendant did know of such ill health,* or that it knew that the premiums were not paid within the sixty days, or that, after learning that the agent had received premiums from the member without regard to the latter's health or ill health, the company ratified such act by retaining premiums thus paid, then the question of waiver was still one for the jury. In our opinion there was such other evidence as we shall presently show.

After Mrs. Keys' death, when the company was undoubtedly well aware of the facts concerning Mrs. Keys' being in arrears for the dues of October and November and of her ill health at the time they were paid, the company, when asked if it intended to insist on the forfeiture, failed to assert such defense, but requested plaintiff to go to the expense of having a guardian appointed for the beneficiaries and insisted upon it, although told by plaintiffs that they had no other property and that the appointment of a guardian was unnecessary unless the claim was going to be paid. There was no absolute denial of liability. The company knew then perfectly well the facts constituting forfeiture by reason of the failure to pay the October

and November dues. Webb had consulted the president and had been told what to do. And when the question was asked whether the company was going to contest or not, Webb instead of frankly telling plaintiffs that it was going to insist on a forfeiture, told them he didn't know but that *his instructions were to have a guardian appointed*. The only function or duty a guardian could possibly have in the premises would be to *receive the money* when it was paid. No guardian was necessary in order to furnish proofs of death or of facts bearing on the question of forfeiture. The blanks furnished by the company did not require any affidavit from the guardian. Those were to be furnished by other persons. The only possible reason the company could have for insisting upon a guardian was to have in existence *some one to whom it could legally and safely pay the money*. The fact that the company did not at once openly and unequivocally announce that there was a forfeiture which would be insisted upon, but shuffled, and evaded the question and wanted proofs of death and a guardian appointed, was some evidence tending to show that the company knew that Mrs. Keys had made former payments while in ill health and that a waiver could be established if plaintiffs had sufficient evidence of the company's knowledge; and that the company intended to hold on to such former payments so long as it appeared certain that its right to declare a forfeiture for nonpayment of the October dues was not thereby jeopardized. In other words, even though the reception and retention of such former premiums may not constitute a waiver, as matter of law, yet such reception and retention and the attendant circumstances can be taken into consideration by the jury, along with all other evidence throwing light upon the conduct of the company, in determining the question whether or not a waiver was created during Mrs. Keys' lifetime. This is strengthened by the fact that on July

5, 1912, defendant took the deposition of Dr. McCall
and from his testimony received actual knowledge that
Mrs. Keys was in bad health on the 20th of August,
1910, and yet retained the May, June, July, August,
and September premiums for nearly three months
thereafter, and never did offer to return said premiums
until after the evidence at the trial was all in and the
case had been closed.   True, this knowledge came af-
ter suit was brought, but the retention of the money
thereafter could be considered as a circumstance bear-
ing upon the question of the previous intention of the
company, and its consequent knowledge at the time it
received said former premiums on August 20th, and of
its conduct in thereafter accepting the premiums for
August and September which Mrs. Keys paid after the
company had received the former dues without asking
as to her health or requiring a certificate.   In other
words, the retention of premiums, after Mrs. Keys'
death and after actual knowledge of all the facts as to
her ill health, could be considered by the jury along
with all the evidence of the company's prior course
of dealing with Mrs. Keys and its subsequent course
of dealing with the plaintiffs, in determining whether
or not there had or had not been a waiver during her
lifetime.   Or, to state it in still smaller compass, the
subsequent retention of premiums, after actual knowl-
edge, would tend to throw some light on the true na-
ture of the company's intention prior to Mrs. Keys'
death and of its probable knowledge of her ill health
before that event, and for that reason could be consid-
ered for that purpose.   At any rate the retention of
premiums, after learning that Mrs. Keys was in bad
health when they were paid, could be considered as a
ratification of the agent's act in accepting them in the
first place.   The agent did not have to actually know
she was sick.   He knew that she was more than sixty
days overdue and that, if ill health was going to cut
any figure, a certificate of good health was required.

Consequently, when the agent took the premiums without the certificate, this was a waiver, on his part at least, of any question as to health, and when the company, after learning that she was in bad health, continued to retain the premiums she had paid, was not this a ratification of the agent's act? And do not all these facts tend to create a situation from which a jury could infer that the company, at the time it took the premiums was doing so without regard to the health or ill health of the member? And if its purpose was to get the premiums regardless of conditions, then the forfeiture was waived. So that, taking all these things into consideration, it cannot be said that, as matter of law, there was no evidence of waiver in the case.

The conduct of the company in not promptly, openly and emphatically declaring a forfeiture is not only admissible and can be considered in determining what was in its knowledge while retaining Mrs. Keys' premiums prior to her death, but, such conduct can also be considered as creating a waiver of its defense of forfeiture after her death, if the company required the appointment of a guardian and plaintiffs were thereby induced to go to the extra trouble and expense of having one appointed. In this case the company did not merely sit close-mouthed letting plaintiffs choose their own course, and then, when the proper time came, raise the defense of forfeiture. It did more than this. While it endeavored, it is true, to place itself where it could insist on a forfeiture if it chose to do so, still it did not unequivocally declare that it would insist on a forfeiture. Even when asked what it was going to do, an evasive answer was given, and the appointment of a guardian was required. And this, too, in the face of the fact that the company knew the children had no property and would need no guardian if the claim were not paid; that the proofs of death, and of the facts bearing upon the forfeiture now relied upon, could be presented without the ap-

pointment of a guardian; and that all a guardian could possibly do in the premises, which could not be done without him, would be to receive payment of the policy. It is true the rules of the company required that, where the beneficiaries were minors, proof of the appointment of a guardian must be made. This, however, was not to establish the death of the insured or any facts showing forfeiture or nonforfeiture, but was necessary only in case the company was going to pay. The appointment of a guardian was not necessary, therefore, to enable the company to inform itself as to any of the facts or to put it in a position where it could assert a forfeiture of the policy. It was incumbent upon the company, therefore, to assert its right of forfeiture then and there, and let plaintiffs take any course they may have seen fit to pursue. The authorities are very strict in holding a defense waived where the company, with knowledge of the facts, causes the plaintiff to go to extra trouble and expense in furnishing proof since such is, by implication, a recognition of the continued validity of the policy. In Titus v. Ins. Co., 81 N. Y. 409, the company, with knowledge of the facts constituting a forfeiture, required the insured to appear before an examiner and submit to an examination. It was held that this constituted a waiver. At page 419, the court says: "When there has been a breach of a condition contained in an insurance policy, the insurance company may or may not take advantage of such breach and claim a forfeiture. It may, consulting its own interests, choose to waive the forfeiture, and this it may do by express language to that effect, or by acts from which an intention to waive may be inferred, or from which a waiver follows as a legal result. A waiver cannot be inferred from its mere silence. It is not obliged to do or say anything to make the forfeiture effectual. It may wait until claim is made under the policy, and then, in denial thereof, or in defense of a

suit commenced therefor, allege the forfeiture. But it may be asserted broadly that if in any negotiations or transactions with the insured, after knowledge of the forfeiture, it recognizes the continued validity of the policy, or does acts based thereon, or requires the insured by virtue thereof to do some act or incur some trouble or expense, the forfeiture is as matter of law waived; and it is now settled in this court, after some difference of opinion, that such a waiver need not be based upon any new agreement or an estoppel." It was contended in that case that the act relied upon to constitute waiver must be attended with such equitable circumstances as would constitute estoppel, and that as the plaintiff was not induced to in any manner change his position, as the acts were done after the forfeiture occurred, they did not create an estoppel. The court, however, said this position was untenable; that it is not true that such waiver can be created only by such acts or conduct as would create a technical estoppel. In Cannon v. Home Ins. Co., 53 Wis. 585, there was a breach of conditions out of which a forfeiture arose. The company was asked if it was going to insist on the forfeiture. Without saying whether it was or not, it requested proofs of loss which the insured furnished at a cost of about twenty-five dollars. The court held that the forfeiture was waived. It was argued in that case that, as the company did not say it would pay, there was no misleading of plaintiff to his injury. But the court asks why did not the company say that it would insist upon the forfeiture? It further held that the requiring of proofs of loss was a treating of the policy as still in force, and the question therefore arose, was the plaintiff, in relying upon such conduct, misled to his injury or prejudice?

In Traders, etc., Ins. Co. v. Johnson, 200 Ill. 359, it is held that if a company has knowledge of its right to declare a forfeiture, but did not then insist upon it but recognized the continued validity of the policy

by requiring the beneficiary to go to the expense and trouble, if any, of preparing proofs of death and other facts connected with the loss, an intention to waive the forfeiture follows as a legal result.

In Granger v. Manchester Ins. Co., 119 Mich. 177, it was held that where the company, with knowledge of the forfeiture, called for additional proofs, the forfeiture was waived although in the letter calling for the proofs there was a general statement that the company did not thereby waive any defense it might have. This was certainly as strong as the stipulation in the rules of the company, in the case at bar, that the requirement of proofs would not waive any defense.

In Bowen v. Ins. Co., 69 Mo. App. 272, the forfeiture relied on was the violation of the "iron safe" clause. The company did not discover the violation of this clause until the adjusters were on the ground. The evidence tended to show that, with this knowledge, the adjusters requested Bowen to assist in going over the books with them. He did so for six or eight hours, and then they notified him that the company denied all liability by reason of the violation aforesaid. It was held that the court properly submitted the question of waiver to the jury.

In Dolan v. Missouri Town Mut. Ins. Co., 88 Mo. App. 666, l. c. 674, it is said: "If a defendant, through its agents, after becoming aware of its defenses, has led plaintiff into additional expense and trouble in preparing proofs of loss, it would be considered as having waived such defenses of which it was aware at the time.

In New York Ins. Co. v. Baker, 83 Fed. 647, l. c. 652, it is said that after the company "became aware that the policy was invalid, it was not entitled to exact from the plaintiff a technical compliance with the provisions of the policy relative to proofs of loss, which would involve her in trouble and expense, unless, on

its part, it had resolved to pay the loss when such proofs were supplied.''

But it is contended by defendant that this rule has no application here because plaintiffs knew from the refusal to accept the premiums, and the endeavor to return them, that the company was going to insist on the forfeiture, and consequently they were not misled to their injury or prejudice. But no one told plaintiffs positively that the company was going to deny liability. The plaintiffs knew, and all they knew was, that the local agent had taken certain steps to preserve the company's right to a forfeiture *if it chose to insist upon it.* And while the mere furnishing of blanks at plaintiffs' request, with the notice contained in said blanks that furnishing them did not waive any of the company's rights, may not, *of itself,* constitute a waiver (which we do not decide), yet in this case there was much more than this. The company was told that the children had no other property and that the proofs of death could be made and the question of the company's liability could be litigated without the appointment of a guardian if the company was going to refuse payment. To this the agent replied he did not know what the company would do but that its instructions were to have a guardian appointed. It would seem that under these circumstances the question whether the plaintiffs were thereby induced to go to the trouble and expense of having a guardian appointed, in such manner as to constitute a waiver, should have been submitted to the jury.

To sum it all up, on the question of whether a demurrer to the evidence should have been sustained, we think that the company, through its agent Webb, knew that Mrs. Keys was more than sixty days in arrears when she paid her May, June, and July dues on August 20th, and, by the receipt and retention of such dues *without requiring a certificate of health,* the

company waived the forfeiture arising out of those facts, or, at least, to state it more accurately, evidence of the stated and attendant facts was sufficient to send the question of waiver to the jury, and evidence of the subsequent retention of the premiums, after actual notice, through Dr. McCall's testimony, of her ill health, was admissible as throwing light upon the intention disclosed by the prior receipt and retention of such sums. It was also admissible as showing a waiver by way of ratifying the agent's act in accepting the premiums of August 20th, regardless of the question of health.

We think also that there was sufficient evidence requiring the submission to the jury of the question, whether or not the company, by failing to state positively and definitely that the forfeiture would be insisted upon, and by requesting the appointment of a guardian, induced plaintiffs to go to the extra trouble and expense of obtaining a guardian, thereby resulting in the waiver, by the company, of the defense of forfeiture. So much for the question of the propriety of the court's ruling upon the defendant's demurrer to the evidence. It was properly overruled.

We are next to inquire whether the question of waiver was properly submitted to the jury. The question whether the company on August 20, waived the forfeiture on account of Mrs. Keys being delinquent and in ill health, would depend upon whether the company took her payment of that date with knowledge of her ill health, or with knowledge that she was more than sixty days overdue and without requiring a health certificate, which was the same as taking it without regard to her health or ill health, or would depend upon whether the company, after receiving actual knowledge of her ill health through Dr. McCall's testimony, ratified the agent's act in receiving her premiums on August 20th, without a certificate, by retaining said premiums and failing to return them. Whether there was

such prior knowledge or subsequent ratification was for the jury to say. If the company took and kept the premiums of August 20th, with knowledge, then it waived the forfeiture at that time; or if, without knowledge that the agent had accepted her premiums out of time, or while she was in bad health, the company nevertheless retained such premiums after learning that she was in bad health at the time the agent received them, such retention by the company would amount to a ratification of such agent's act and relate back to and effect a forfeiture as of the time when the agent accepted said premiums. In this view of the matter such subsequent retention would not be a revival of a cause of action already dead but would be merely the election to keep alive that which would live or die according to the choice of the company. If plaintiffs' instruction No. 2 means to rely upon the retention of the premiums paid August 20th, after having actual knowledge of the facts, to constitute a waiver by way of ratification of the agent's act, then it would be correct provided it clearly and unmistakably expressed that idea, and left it to the jury to say whether or not all those things occurred. The instruction is somewhat involved and therefore not as clear as it might be. In addition to this, a few words were evidently omitted, so that its meaning is still more obscure. As it was the only instruction defining waiver caused by the reception and retention of premiums; and as the court modified defendant's instruction, and, in such modification, referred to plaintiffs' instruction No. 2 for a definition of waiver, the omission in said last named instruction became doubly important. As the instruction reads, with the omission unsupplied, it is meaningless. We cannot say that the jury understood its meaning from the argument made in the case. It is much better to require instructions to say what they mean than to allow important omissions to be made therein and then attempt to ascertain whether

or not the jury understood what was left out.    It is difficult enough to understand the average instruction without making it a still greater puzzle by requiring the jury or the court to guess at what was intended to be said.

With reference to the evidence showing that Mrs. Keys' neighbors knew she was sick, we think it was error to admit such testimony.    The purpose was to show that the company had actual knowledge of her sickness.    It was not shown that knowledge of the neighbors was of such a character as to show or even raise an inference that it was communicated to the company or reached the ears of the agent.    Hence it had no efficacy in showing knowledge of either the company or the agent.    For the reasons given the judgment is reversed and the cause remanded for a new trial.    All concur.